# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**BLUE WATER IMPORTERS, INC.,**
*et al.*,

               **Plaintiffs,**                    **Case No. 2:20-cv-1893**
                                          **JUDGE EDMUND A. SARGUS, JR.**
        **v.**                              **Magistrate Judge Kimberly A. Jolson**

**THOMAS J. STICKRATH, DIRECTOR
OF THE OHIO DEPARTMENT OF
PUBLIC SAFETY,** *et al.*,

               **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Defendants Thomas J. Stickrath and Charles L. Norman's Motion for Summary Judgment (ECF No. 98), and Plaintiff Blue Water Importers, Inc.'s Motion for Summary Judgment (ECF No. 99). For the following reasons, the Court **GRANTS IN PART** Defendants' Motion for Summary Judgment, **DENIES IN PART** Plaintiff's Motion for Summary Judgment, and **DENIES AS MOOT IN PART** both motions.

### I. Background

This case involves challenges to the State of Ohio's requirements for titling pre-owned automobiles imported from Canada under 42 U.S.C. § 1983 and the Commerce Clause of the U.S. Constitution. (*See generally* Am. Compl., ECF No. 13.)

#### A. The parties

Plaintiff Blue Water Importers, Inc. ("Blue Water") is a Michigan corporation in the business of importing and conforming pre-owned Canadian automobiles to meet federal motor vehicle safety and emissions standards, and "assisting its customers [in the United States] to obtain

1

Certificates of Title for the imported Canadian motor vehicles." (*Id.* ¶ 13.)  Blue Water is a "Registered Importer certified and approved by the National Highway Traffic Safety Administration ("NHTSA") to conform vehicles manufactured for countries other than the United States to the federal motor vehicle safety standards and federal bumper standards." (Deposition of William Dempsey, Ex. C., ECF No. 98-4.)

Defendant Thomas J. Stickrath is the Director of the Ohio Department of Public Safety. (Am Compl. ¶¶ 14–15; Notice of Substitution of Parties, ECF No. 62.)  Defendant Charles L. Norman is the Registrar of the Ohio Bureau of Motor Vehicles ("BMV"), a division of the Ohio Department of Public Safety. (*Id.*)  Defendants are responsible for administering Ohio's motor vehicle title laws.  *See* Ohio Rev. Code § 4505, *et seq.*  Blue Water seeks declaratory and injunctive relief against Defendants in their official capacities.  (Am. Compl. ¶ 20.)

### B. Federal regulatory framework for importing used Canadian automobiles

Blue Water's claims concern the interplay between the federal regulations governing the importation of Canadian vehicles and Ohio's requirements for obtaining certificates of title for those vehicles following importation.  (*See generally* Am. Compl.)

Congress delegated authority to the Secretary of Transportation to promulgate regulations governing the import of motor vehicles from outside the United States. 49 U.S.C. § 30141(b). Generally, a motor vehicle from outside the United States may be imported if the vehicle is "capable of being brought into compliance with" federal motor vehicle safety standards. *Id.*; 49 C.F.R. § 593.5.  Most pre-owned Canadian passenger vehicles are pre-approved for import into the United States.  Appendix A to 49 C.F.R. § 593.  Canadian-certified vehicles can be imported by an importer registered with the NHTSA—a "Registered Importer"—or by a person who has a contract with a Registered Importer.  (Dempsey Dep., Ex. C.)  The Registered Importer will

"modify the vehicle so that it complies with all applicable Federal motor vehicle safety standards following importation."  (Dempsey Dep., Ex. C.)

A Registered Importer must complete several steps to import a vehicle from Canada for sale in the United States.  The importer must "furnish to the Secretary of Homeland Security at the time of importation a bond in an amount equal to 150 percent of the dutiable value of the vehicle." 49 C.F.R. § 592.6(a).  The importer must also file a declaration with U.S. Customs and Border Protection ("CBP") that the vehicle "does not conform with all applicable Federal motor vehicle safety and bumper standards (but does conform with all applicable Federal theft prevention standards)," but the importer is nonetheless eligible to import the vehicle because the importer: (1) "furnished a bond in an amount equal to 150% of the dutiable value of the vehicle"; (2) the importer is registered with NHTSA to conform the vehicle to federal safety and bumper standards; and (3) the vehicle is not salvaged or reconstructed.  *Id.* § 591.5(f).

After CBP approves the vehicle's eligibility for import, the Registered Importer has 120 days to certify that the vehicle has been brought into conformity "with all applicable Federal motor vehicle safety and the bumper standards."  *Id.* § 592.6(d).  The Registered Importer is deemed the "manufacturer" of any motor vehicle it "brings into compliance" after importation.  49 U.S.C. § 30147.  Vehicles imported from Canada pursuant to this process are referred to in the industry as "Box 3" vehicles due to their designation under Box 3 on the CBP form.  (Dempsey Dep., Ex. C.) After a Registered Importer brings a Box 3 vehicle into compliance, it submits to NHTSA a "conformity package[.]"  (Dempsey Dep., Ex. C.)  The conformity package must include a declaration of conformity, the make, model, model year, odometer reading, and VIN, the "location of the facility where the vehicle was conformed," a copy of the bond furnished at the time of import, and photographs demonstrating conformity.  49 C.F.R. § 592.6(d).

After NHTSA receives the importer's certification, NHTSA has 30 days to notify the Registered Importer whether an inspection is required to verify certification. *Id.* § 592.8(c). Thus, Federal regulations prohibit the importer from obtaining "title, licensing, or registration of the motor vehicle for use on the public roads" for 30 days after NHTSA receives its certification. *Id.* § 592.8(a), (d). If NHTSA accepts a certification without requiring an inspection, the administration "shall" provide the Registered Importer, within 25 days, a letter accepting certification and releasing the bond posted during importation (a "bond release letter"). *Id.* § 592.8(f). But if the "Registered Importer has received no written notice" within 30 days, the importer "may release the vehicle from custody, sell or offer it for sale, or have it titled, licensed, or registered for use on the public roads." *Id.* § 592.8(e).

### C. Relevant Ohio requirements for titling imported Canadian used automobiles

Ohio law requires sellers of motor vehicles within the state to transfer to the buyer a certificate of title; it also prohibits buyers from "otherwise acquir[ing] a motor vehicle without obtaining a certificate of title. Ohio Rev. Code § 4505.03. The state vests authority to issue certificates of title in the clerks of the county courts of common pleas. *Id.* §§ 4505.02, 4505.06(A)(1). The Ohio legislature delegates to the Registrar of the BMV the responsibility to "issue rules as the registrar determines necessary to ensure uniform and orderly operation of [the motor vehicle title laws] and to ensure that the identification of each applicant for a certificate of title is reasonably accurate." *Id.* § 4505.02. The county clerks of court must "conform" to the rules issued by the Registrar. *Id.* The clerks must also provide the forms for obtaining a certificate of title as prescribed by the Registrar. *Id.*

The BMV issues guidance to county clerks on procedure for issuing certificates of title through "Title Broadcasts." (Deposition of Sarah Stedtefeld 24:17–20, ECF No. 98-2.) Clerks are

expected to adhere to the requirements for titling vehicles that the BMV sets out in the Title Broadcasts. (Deposition of Kathleen Corrigan 79:6–10, ECF No. 98-1.)

Two different procedures the BMV established through Title Broadcasts in October of 2015 are at issue in this case.

### 1. "Bond release letter requirement" of Title Broadcast 15-1016

On October 16, 2015, the BMV issued Title Broadcast 15-1016 to all county clerks offices regarding "Vehicles Imported from Canada and Other Foreign Countries." (Stedtefeld Dep., Ex. 8.) The Title Broadcast informed clerks that title applications for "imported vehicles coming into Ohio from Canada and other foreign countries should include" several different documents. (*Id.*) Important for this case, the Title Broadcast stated that, if the vehicle was a "Box 3" vehicle (a pre-owned import from Canada), "an Original Bond Release Letter from" NHTSA was required for verification that the "Federal Motor Vehicle Safety Standards have been, or will be, met." (*Id.*) The Court will refer to this policy as the "bond release letter requirement."

Title Broadcast 15-1016 explains what is required, but it does not explain why. In early 2015, county clerks reported to the BMV a major increase in volume of title applications for vehicles imported to Ohio from Canada. (Corrigan Dep. 108:11–15.) The clerks requested guidance on what was required to issue title for such vehicles; at the time, the last guidance issued from the BMV on the titling of Canadian imports was issued in 2002. (Stedtefeld Dep. 70:22–71.) The BMV researched the federal regulations and issued its first Title Broadcast regarding Canadian vehicles on May 1, 2015. (*Id.* at 70:14–71:15.) It issued another Title Broadcast on May 8, 2015. (*Id.*, Ex. 4.) But it was not until October 2015 that the BMV told the county clerks that applicants must produce the original bond release letter from NHTSA as part of a title application. (Stedtefeld Dep., Exs. 3–4.)

So why in October of 2015 did the BMV decide to require applicants to produce the original bond release letter from NHSTA?  According to Kathleen Corrigan, the BMV's Administrator of the Office of Vehicle Services, county clerks had been receiving different types of documents as part of title applications for imported Canadian vehicles and requested clarification from the BMV. (Corrigan Dep. 70:5–71:4.)  After researching the federal regulations and discussing the issue with officials from NHTSA, the BMV decided that an original bond release letter was required as part of a title application for a pre-owned vehicle imported from Canada.  (*Id.* at 72:6–14.)

After establishing the bond release letter requirement, the BMV began receiving complaints from the Independent Dealers Association that importers were not receiving their bond release letters from NHTSA within 30 days.  (*Id.* at 95:3–10.)  Recall that the federal regulations permit an importer to have release a "Box 3" vehicle "from custody, sell or offer it for sale, or have it titled" if NHTSA has not issued a bond release letter within 30 days after the importer certifies compliance.  49 C.F.R. § 592.8(e).  But under Ohio's new bond release letter requirement, the clerk could not issue a certificate of title for a vehicle without the original bond release letter from NHTSA—even if 30 days had passed since the importer submitted a conformity package to NHTSA.  (Stedtefeld Dep., Ex. 8.)  Thus, the Independent Dealers Association submitted complaints because dealers had to wait longer to receive certificates of title due to Ohio's bond release letter requirement.  (Corrigan Dep. 103:3–9.)

In March of 2016, the BMV reached out to NTHSA's Chief of the Import and Certification, Coleman Sachs, for clarification on NHTSA's bond release letter policy.  (*Id.*)  Sachs informed the BMV that, due to a sharp increase in vehicle imports from Canada, NHTSA could no longer issue bond release letters within 30 days.  (Corrigan Dep. at 102:3–23; Stedtefeld Dep. 106:24– 107:4.)  But Sachs informed the BMV that federal regulations permit the titling of vehicles if

NHTSA has not issued a bond release letter within 30 days after the importer certifies compliance. (Corrigan Dep. 102:19–103:2.)

In December of 2016, the BMV issued Title Broadcast 16-1202 and rescinded the bond release letter requirement. (Stedtefeld Dep., Ex. 9.) Title Broadcast 16-1202 informed county clerks that applications for title of imported Canadian vehicles now required either: (1) a copy of the bond release letter from NHTSA; or (2) "evidence that [the applicant] submitted a timely certification of compliance to NHTSA . . . but NHTSA did not issue a Bond Release Letter or otherwise respond to the certification of compliance within thirty (30) days . . . ." (*Id.*) The BMV issued a Title Broadcast in January of 2019 informing county clerks that the procedure from Title Broadcast 16-1202 remained in place. (*Id.* at 112:12–20.) The bond release letter requirement therefore was in effect from October 2015 to December 2016.

### 2. "In-state inspection requirement" of Title Broadcast 15-1006

The second titling requirement at issue in this case is Ohio's physical inspection requirement for an applicant seeking a certificate of title for a used vehicle brought into Ohio from out of state. Ohio law states that, if an "application for a certificate of title refers to a motor vehicle last previously registered in another state, the application shall be accompanied by a physical inspection certificate issued by the department of public safety . . . ." Ohio Rev. Code § 4505.061. The physical inspection must "verify the make, body type, model, and manufacturer's vehicle identification number of the motor vehicle for which the certificate of title is desired." *Id.* And the "physical inspection certificate shall be in such form as is designated" by the Registrar of the BMV. *Id.*

In February of 2015, the BMV issued a Title Broadcast informing county clerks that the physical inspection requirement could be satisfied by submitting an "Out of State Inspection form"

from one of twenty specified states as part of the title application.  (Stedtefeld Dep., Ex. 2.)  The BMV determined that these states' forms were acceptable because they required the same information to be physically verified as Ohio: the VIN, make, year, and model of the vehicle.  (*Id.* at 31:13–16.)  However, the BMV began experiencing issues with consumers in some states submitting fraudulent documents during out-of-state physical inspections.  (Stedtefeld Dep. 59:3–15.)

In October of 2015, the BMV rescinded the policy of accepting inspection forms from other states.  The BMV concluded that county clerks lacked statutory authority "to accept other states' out-of-state inspection forms" as part of the title applications for vehicles last registered out of state.  (Corrigan Dep. 56:18–57:8.)  It then issued Title Broadcast 15-1006 informing county clerks that the State would "no longer accept out of state inspections unless the inspection is completed by an Ohio Licensed Motor Vehicle Dealer, Ohio Deputy Registrar, or [BMV] investigator and is reported on a BMV 3706 form."  (Stedtefeld Dep., Ex. 5.)  The Court will refer to this policy as the "in-state inspection requirement."

The in-state inspection requirement has two exceptions for persons who hold an Ohio driver's license: one for Ohio residents serving in the military and one for Ohio residents who live temporarily outside of Ohio.  (*Id.*)  These individuals may have the required physical inspection performed by a "United States Military Authority" or a law enforcement officer on the BMV's authorized form.  (*Id.* at 52:10–53.)  Inspections cost a maximum of $5 per vehicle.  (*Id.* at 68:3–4.)  The in-state inspection requirement applies to pre-owned vehicles imported from Canada.  (Stedtefeld Dep., Ex. 9.)

According to the Chief of Dealer Licensing for the BMV, the in-state inspection requirement ensures that: "(a) the motor vehicle for which an application for title is being made is

8

the same motor vehicle to which the accompanying documentation refers, and (b) the motor vehicle to which the accompanying documentation refers actually exists and is physically located in Ohio." (Affidavit of Sarah Imler ¶ 4, ECF No. 102-1.)  The American Association of Motor Vehicle Administrators ("AAMVA") cautions that "[d]uring the importation process, not every vehicle is physically inspected by CBP and each inspector does not always check confidential VINs." (Imler Aff., Ex. A-1.)  For this reason, the AAMVA Imported Vehicles Working Group recommends that "jurisdictions develop a physical inspection program to ensure the vehicle is physically located in the jurisdiction where it is being titled and that the vehicle is properly identified." (*Id.*)

### D.  Plaintiff Blue Water's importation business and alleged harm from Ohio's titling requirements

Blue Water is a Michigan company operating as a Registered Importer of used vehicles from Canada. (Dempsey Dep. 15:2–16.)  Blue Water contracts with car dealers in Canada and the United States who want to import pre-owned Canadian vehicles into the United States to sell those vehicles, usually in Michigan or Ohio. (*Id.* at 17:15.)  The company imports roughly 500 to 600 cars per month. (*Id.* at 19:2–3.)  Blue Water imports the vehicles, conforms the vehicle to federal motor vehicle safety standards, and submits the required conformity package to NHTSA. (*Id.* at 18:1–13.)  Once the conformity package has been submitted, Blue Water holds the vehicle for 30 days pursuant to 49 C.F.R. § 592.8, or for less than 30 days if the company receives a bond release letter prior to the lapse of 30 days. (*Id.*)

Once the vehicles are permitted to be titled or released from custody per the federal regulations, Blue Water completes the steps necessary to receive the certificates of title for those vehicles in Michigan or Ohio. (*Id.* at 21:10–18.) Blue Water also arranges for the transportation of the imported vehicle according to the dealer's instructions. (*Id.* at 19:1–21:5.)  For example,

after a truckload of imported Canadian vehicles are ready to be titled, Blue Water arranges for those vehicles to be transported to a place such as an auto auction in Ohio, at which the dealer will sell the vehicle once title has been issued.  (*Id.* at 19–23.)

The transporter moving the vehicles from Michigan to Ohio must stop at an Ohio dealer to obtain the in-state inspection required for a title application.  (*Id.* at 45:14–46:2.)  Blue Water has utilized a used-car dealership in Toledo to perform some of its inspections.  (*Id.* at 46:10–12.)  Inspections are performed during typical business hours.  (*Id.* at 79:10–26.)  The transport truck typically carries six to seven cars, and the cars can be physically inspected while still on the transport truck.  (*Id.* at 47:20–24.)  An inspection of six to seven cars takes a "half hour, [to an] hour" total.  (*Id.* at 47:13.)  Blue Water pays the inspection fee and compensates the transporter an additional $25 per load for the time spent obtaining the physical inspection.  (*Id.* at 94:23–95:2, 98:10–11.)  Blue Water also pays another company called "Vehicle Title Services" to use its Ohio address as required for the titling of a vehicle in Ohio.  (*Id.* at 95:16–17.)

According to Jack Dempsey (Blue Water's owner), Blue Water lost two clients after Ohio established the bond release letter requirement.  (Dempsey Dep. 99:16–20.)  At the time, NHTSA was "often as much as eight months behind in processing the paperwork for imported motor vehicles and sending the bond release letter."  (Pl.'s Answers to Interrogatories at No. 4, ECF No. 98-4.)  But Ohio could not issue a certificate of title until NHTSA returned the original bond release letter to Blue Water.  This delay would "destroy any profit anticipated by importing vehicles from Canada" because car dealers "cannot tie up millions of dollars in depreciating inventory waiting for the bond release letter to be able to obtain a certificate of title."  (*Id.*)  Since Ohio rescinded the bond release letter requirement in December of 2016, Blue Water has not suffered harm as a result of that policy.  (Dempsey Dep. 104:20–1.)

### E. Procedural history

Blue Water and other plaintiffs, Canadian car dealerships that contract with Blue Water to import and sell used Canadian vehicles, initiated this action against Defendants in the Northern District of Ohio on October 7, 2016 under 42 U.S.C. § 1983. (Compl., ECF No. 1.) Blue Water filed an Amended Complaint in January of 2017 adding three individual county clerks of court as defendants in their official capacities. (Am. Compl.) In November of 2018, Blue Water and other Plaintiffs (who are no longer part of this lawsuit) sought a motion for a temporary restraining order. (ECF No. 46.) Judge Helmick denied that motion. (ECF No. 49.) Judge Helmick also denied Defendants' motion to dismiss, but granted a motion to dismiss as to the county clerks of court. (ECF No. 54.) The case was subsequently transferred to the Southern District of Ohio. (ECF No. 75.) The other plaintiffs are no longer part of this action. (ECF No. 91.)

Blue Water alleges in the Amended Complaint that the bond release letter requirement and the in-state inspection requirement both violate the Commerce Clause, the "dormant" Commerce Clause, and the Foreign Commerce Clause of the Constitution. (Am. Compl. ¶¶ 98–126.) Blue Water now moves for summary judgment on its claims and seeks declaratory and injunctive relief. (Pl.'s Mot. Summ. J. ["Pl.'s Mot"], ECF No. 99.) Defendants also move for summary judgment on each of Blue Water's claims. (Defs.' Mot. Summ. J. ["Defs.' Mot."], ECF No. 98.)

### II. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has

the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts."). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n.*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

### III. Analysis

Blue Water moves for summary judgment on its claims that the challenged Ohio policies violate the Commerce Clause and dormant Commerce Clause.  (Pl.'s Mot.)  Blue Water challenges (1) the Ohio bond release letter requirement in effect from October 2015 to December 2016 and (2) Ohio's in-state inspection requirement for titling out-of-state used motor vehicles.  (Pl.'s Mot.)

12

It argues that that bond release letter requirement is preempted by federal law.  (Pl.'s Mot. at 11–12.)  Blue Water also argues that the bond release letter requirement and the in-state inspection requirement impose undue burdens on interstate commerce, in violation of the dormant Commerce Clause, U.S. Const. art. 1, § 8, cl. 3.  (*Id.* at 10–17.)

Defendants also move for summary judgment on each of Plaintiff's claims. (Defs.' Mot.) Defendants contend that: (1) Blue Water has not suffered an injury resulting from the challenged policies and that it therefore lacks standing to maintain these claims; (2) Blue Water's challenge to the now-rescinded bond release letter requirement is moot, but that it was not preempted and did not violate the dormant Commerce Clause in any event; and (3) Ohio's in-state inspection requirement does not violate the dormant Commerce Clause or Foreign Commerce Clause. (*See generally* Defs.' Mot.)

Blue Water has suffered an injury-in-fact and has standing to pursue this action.  However, Blue Water's challenge to the bond release letter requirement is moot.  Furthermore, there are no genuine disputes of fact, and Ohio's in-state inspection requirement does not violate the dormant Commerce Clause or the Foreign Commerce Clause.

## A. **Blue Water's injury-in-fact under Article III of the Constitution**

Before reaching the merits of Blue Water's claims, the Court must first determine whether Blue Water has standing under Article III of the Constitution.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (citing *Ex parte McCardle*, 7 Wall. 506, 514 (1868)) ("Without jurisdiction the court cannot proceed at all in any cause.").  Article III of the Constitution limits the exercise of the judicial power to "Cases" and "Controversies." U.S. Const., art. III, § 2.  To invoke the federal judicial power, a plaintiff must have standing.  *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017)).  A "plaintiff must demonstrate standing for each claim

he seeks to press and for each form of relief that is sought." *Id.* (citing *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008)). To have standing to sue under Article III, a plaintiff must have suffered (1) an injury in fact, (2) caused by defendants, that is (3) redressable by judicial decision. *Thomas v. TOMS King (Ohio), LLC*, 997 F.3d 629, 634 (6th Cir. 2021) (citing *Spokeo v. Robins*, 136 S. Ct. 1540, 1547 (2016)).

At issue here are the first two elements: injury in fact and causation. "An injury in fact is one that is 'real, not abstract, actual, not theoretical, concrete, not amorphous.'" *Id.* (citing *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 462 (6th Cir. 2019)). To satisfy causation, the plaintiff must show "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citing *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42 (1976)).

Defendants argue that that Blue Water has not come forward with evidence of an injury in fact caused by any of the policies and procedures enacted or enforced by Defendants. (Defs.' Mot. at 8.) The Court disagrees. Blue Water provides ample evidence of an injury that is fairly traceable to the challenged requirements for obtaining a certificate of title.

Start with the in-state inspection requirement. Blue Water pays truck drivers an additional $25 per vehicle load to compensate for the added time necessary to stop for an inspection in Ohio. (Dempsey Dep. 98:10–20.) If that were not enough, each inspection costs $5 per vehicle. (Dempsey Dep. 78:6–13.) These costs are concrete harms "fairly traceable" to the challenged in-state inspection requirement. *Lujan*, 504 U.S. at 560; *see also, e.g.*, *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 690 n. 14 (1973) ("We have allowed

14

important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote; a $5 fine and costs; and a $1.50 poll tax[.]") (internal citations omitted)).

Blue Water also produces sufficient evidence of an injury caused by the 2015 bond release letter requirement. According to Blue Water, the bond release letter requirement (in effect from October 2015 to December 2016) "tie[d] up millions of dollars in depreciating inventory" because NHTSA was often "as much as eight months" behind in processing paper for imported motor vehicles and sending the bond release letter. (Pl.'s Answers to Interrogatories at No. 4, ECF No. 98-4.) In other words, rather than Ohio issuing a title for an imported vehicle in the absence of the bond release letter after 30 days—as permitted under the federal regulation—the value of the pre-owned, imported vehicles would depreciate as they sat idle waiting for NHTSA to issue a bond release letter for the vehicle. (Pl.'s Resp. in Opp'n at 11, ECF No. 103.) Blue Water's owner testified that the company lost two customers because of the challenged policies. (Dempsey Dep. 99:16–20.)

Defendants' arguments to the contrary are unconvincing. They claim that Blue Water has suffered no cognizable injury because "[a]ll of the cost" is, in the end, borne by Blue Water's customers—the Canadian and American car dealers who hire Blue Water to import and title the pre-owned Canadian vehicles. (Defs.' Reply in Support at 3–4, ECF No. 106.) Defendants continue that, because Blue Water does not own the vehicles it transports—and therefore does not profit from the final sale of the vehicle—Blue Water cannot assert as an injury the time and expense associated with waiting for a bond release letter to obtain a certificate of title. But if Blue Water's clients stop selling pre-owned Canadian vehicles in Ohio because of difficulty and delay obtaining certificates of title, Blue Water loses out on that client's business because the client will no longer hire Blue Water to import Canadian vehicles and arrange for transport to Ohio for sale.

(*See* Pl.'s Answers to Interrogatories at No. 6.) An "indirect" injury is sufficient for Article III standing so long as it is "distinct and palpable" and "fairly traceable" to Defendants' actions. *Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221, 1226 (6th Cir. 1983) (citing *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72 (1978)).

Defendants also reason that Blue Water could simply charge its customers extra to make up for the in-state inspection expenses. (*Id.* at 4.) This argument is not well taken. That a financial injury from complying with a potentially unconstitutional policy on the front end may be mitigated by charging the customer a higher price on the back end does not eliminate the existence of standing to challenge the potentially unconstitutional policy. At bottom, Blue Water has produced sufficient evidence that it suffered an "injury in fact" that is "fairly traceable" to the challenged policies. *See Lujan*, 504 U.S. at 560. Blue Water therefore has standing to pursue these claims against Defendants in their official capacities.

### B. Mootness of Blue Water's challenge to the bond release letter requirement

Blue Water first challenges the bond release letter requirement of the BMV's Title Broadcast 15-1016 issued in October of 2015. (Stedtefeld Dep., Ex. 8, ECF No. 98-2.) Blue Water initiated this lawsuit in October of 2016. (Compl., ECF No. 1.) The BMV rescinded the bond release letter requirement in December of 2016. (Stedtefeld Dep. 114:11–19, Ex. 9.)

Blue Water moves for summary judgment on its claim that bond release letter requirement violated the Commerce Clause, despite the fact that the BMV rescinded that requirement in 2016 shortly after Blue Water initiated this lawsuit. (Pl.'s Mot. at 11.) It argues that the federal regulations governing the inspection of imported vehicles preempts the 2015 bond release letter requirement. (*Id.*) Blue Water requests a declaratory judgment that the bond release letter

requirement was unconstitutional and an injunction prohibiting Defendants from enforcing that policy in the future. (Pl.'s Mot. at 20.)

Defendants also move for summary judgment on Blue Water's claim. Defendants argue that they are entitled to summary judgment because federal law does not preempt its titling regulations, and because its regulations do not violate the Dormant Commerce Clause or the Foreign Commerce Clause. (Defs.' Mot. at 13–24.) They also argue, in response to Blue Water's motion for summary judgment, that Blue Water's challenge to the bond release letter requirement is moot. (Defs.' Resp. in Opp'n at 3, ECF No. 102.) The BMV rescinded that policy in December of 2016 after NHTSA informed the BMV that it was not able to provide bond release letters within 30 days due to an increase in vehicle imports. (*Id.*; Stedtefeld Dep. 106:22–107:3.) Defendants submit that there is no reasonable expectation that the BMV will re-instate the bond release letter requirement following this litigation. (Defs.' Resp. in Opp'n at 4.)

Defendants raise an argument that must be addressed first: whether Blue Water's challenge to the October 2015 bond release letter requirement is moot. A sibling to the doctrine of standing, the doctrine of mootness provides that a claim is no longer justiciable under Article III "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citing *Murphy v. Hunt,* 455 U.S. 478, 481 (1982) (per curiam)). If a case becomes "moot at any point during the proceedings" it falls outside the jurisdiction of a federal court. *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537, 200 L. Ed. 2d 792 (2018) (internal quotations and citation omitted).

Generally, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's*

*Castle, Inc.*, 455 U.S. 283, 289 (1982)). However, an exception to this general rule exists when a defendant "meets the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 190 (citing *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968)). Further, the "cessation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties" so long as the "self-correction" by the government "appears genuine." *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 981 (6th Cir. 2012) (quoting *Mosley v. Hairston*, 920 F.2d 409, 415 (6th Cir. 1990)).

Here, the circumstances surrounding the rescission of the bond release letter requirement demonstrate that the policy "could not reasonably be expected to recur." *Id.* The BMV established the bond release letter requirement in October of 2015 after a spike in Canadian used vehicle imports and confusion among the county clerks about what documents were required for issuing titles for imported pre-owned Canadian vehicles. (Corrigan Dep. 70:5–71:4; Stedtefeld Dep. 103:1–13.) Just a few months after the BMV issued that guidance, the BMV received complaints that NHTSA was taking longer than 30 days to issue bond release letters. (Corrigan Dep. at 102:4–12.) The BMV reached out to NTHSA for clarification, and in March of 2016, NHTSA confirmed that it could not issue bond release letters within 30 days, but that NHTSA permitted vehicles to be titled after 30 days even if it had not issued a bond release letter. (Corrigan Dep. at 102:3–23; Stedtefeld Dep. 106:24–107:4.) Blue Water filed this lawsuit in October of 2016. The BMV subsequently issued a new Title Broadcast in December of 2016 informing clerks that a bond

release letter from NHTSA was not required if the customer could present evidence that 30 days had lapsed since certification of compliance was presented to NHTSA.  (Stedtefeld Dep., Ex. 9.)

These facts paint a picture of state officials attempting in good faith to comply with NHTSA guidance. Blue Water has not suffered harm as a result of that policy since the BMV rescinded that policy in December of 2016.  (Dempsey Dep. 92:24–93:5; 104:20–105:1.) And the BMV affirmed its December 2016 guidance in a January 2019 Title Broadcast.  (*Id.* at 112:7– 113:5, Ex. 10.) That policy has now been in place for over four-and-a-half years.  Defendants' representations provide adequate assurance that, absent a change in guidance from NHTSA, Defendants cannot reasonably be expected to reinstate the bond release letter requirement.  (Defs.' Resp. in Opp'n at 4.)

Blue Water suggests that Defendants' burden to show mootness is much harder to meet because Defendants are regulatory officials who may unilaterally revive an abandoned policy post-litigation. (Pl.'s Reply in Support at 3, ECF No. 107.)  Indeed, the Sixth Circuit has recognized that reversing the cessation of challenged conduct is not "particularly burdensome" when the cessation was achieved pursuant to executive directive rather than the legislative process. *A. Philip Randolph Inst. v. Husted*, 838 F.3d 699, 713 (6th Cir. 2016), *rev'd on other grounds*, 138 S. Ct. 1833 (2018).  In that case, the court noted that the circumstances surrounding Secretary of State's cessation of the challenged policy "did not inspire confidence in his assurances regarding the likelihood of recurrence."  *Id.*  The Secretary's cessation did not appear genuine because he changed the policy "on the same day as the parties' final merits briefs were due before the district court, attaching the form as an exhibit to his brief and only then presenting his mootness argument."  *Id.*  In this case, to the contrary, the circumstances surrounding the cessation of the bond release letter requirement inspire confidence that the requirement is not likely to recur.  The

cessation by the BMV of the challenged policy, although it may be unilaterally reenacted, appears to be a genuine attempt to comply with NHTSA guidance rather than a surreptitious attempt to moot this litigation.

In the end, rendering an opinion on the constitutionality of a policy discontinued over four-and-a-half years ago—with no indication that such policy is at all likely to recur—would be nothing more than an advisory opinion. And federal courts "do not render advisory opinions." *Golden v. Zwickler*, 394 U.S. 103, 108 (1969). Blue Water has already obtained the ultimate relief it seeks—the rescission of the 2015 bond release letter requirement. Blue Water's challenge to the bond release letter requirement of Title Broadcast 15-1016 is therefore moot. And because Blue Water only seeks declaratory and injunctive relief regarding the bond release letter requirement of Title Broadcast 15-1016 (as opposed to the BMV's current policy), the Court denies as moot the parties' motions for summary judgment as to the bond release letter requirement, and dismisses as moot Blue Water's claims under 42 U.S.C. § 1983 regarding that policy.

### C.  Blue Water's challenge to Ohio's in-state inspection requirement

Blue Water moves for summary judgment on its claim that Ohio's in-state inspection requirement for out-of-state used vehicles violates the dormant Commerce Clause. (Pl.'s Mot. at 17.) Defendants also move for summary judgment on this claim and on Blue Water's claim that Ohio's titling requirements violate the Foreign Commerce Clause. (Defs.' Mot. at 19, 24.)

Under the Commerce Clause, Congress has the power to "regulate Commerce with foreign Nations, and among the several States . . . ." U.S. Const. art. 1, § 8, cl. 3. This affirmative grant of power to Congress contains a negative implication—known as the "dormant Commerce Clause"—that "denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 369 (6th

Cir. 2013) (quoting *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 98 (1994)). "The dormant Commerce Clause is driven by concern about economic protectionism— that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* (quoting *Dept. of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008) (internal quotations omitted)). In the context of foreign commerce, "a State's power is further constrained because of 'the special need for federal uniformity.' *Barclays Bank PLC v. Franchise Tax Bd. of California*, 512 U.S. 298, 311 (1994) (quoting *Wardair Canada Inc. v. Florida Dep't of Revenue*, 477 U.S. 1, 8 (1986)).

The Sixth Circuit has adopted a two-step test to evaluate challenges under the dormant Commerce Clause. *Id.* (citing *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644 (6th Cir. 2010)). At the first step, a court must determine whether "a state statute [or regulation] directly regulates or discriminates against interstate commerce, or [whether] its effect is to favor in-state economic interests over out-of-state interests." *Id.* at 369–70 (citing *Int'l Dairy*, 622 F.3d at 644). A state statute or regulation "can discriminate against out-of-state interests in three different ways: (a) facially, (b) purposefully, or (c) in practical effect." *Int'l Dairy*, 622 F.3d at 648. "[T]he critical consideration is the overall effect of the statute on both local and interstate activity." *Am. Beverage Ass'n*, 735 F.3d at 370 (quoting *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986)). The plaintiff bears the initial burden of proof to show that the state regulation is discriminatory. *Id.* (citing *Davis*, 553 U.S. at 338).

If the plaintiff satisfies its burden at the first step, "a discriminatory law is virtually *per se* invalid and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Id.* (quoting *Davis*, 553 U.S. at 328). However, if the challenged regulation is "neither discriminatory nor extraterritorial, then the court

must apply the balancing test established in" *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). *Id.* (citing *Int'l Dairy*, 622 F.3d at 644). Under the *Pike* balancing test, the state regulation is upheld "unless the burden it imposes upon interstate commerce is 'clearly excessive in relation to the putative local benefits.'" *Int'l Dairy*, 622 F.3d at 644 (quoting *Pike*, 397 U.S. at 142). The "'critical consideration' in any dormant Commerce Clause analysis is 'the overall effect of the statute on both local and interstate activity.'" *Int'l Dairy*, 622 F.3d at 646 (citing *Brown–Forman Distillers*, 476 U.S. at 579).

In this case, the in-state inspection requirement does not discriminate against out-of-state interests. It also survives the *Pike* balancing test.

### 1. Whether the in-state inspection requirement discriminates against out-of-state interests.

Blue Water argues that the in-state inspection requirement discriminates against out of state goods on its face and has the practical effect of discriminating against out-of-state importers of used vehicles. (Pl.'s Mot. at 18; Pl.'s Reply in Support at 10.) It also argues that the requirement imposes an additional burden on out-of-state vehicle importers like Blue Water, which has the practical effect of "reducing the importation" of vehicles from Canada into the state. (Pl.'s Mot. at 18.)

As Defendants point out, however, it is undisputed that any "applicant"—whether in state or out of state—applying for titling of a vehicle "last previously registered in another state" must comply with the in-state physical inspection requirement. Ohio Rev. Code § 4505.06(A)(3). The statute contains different requirements for titling vehicles: (a) that were "last previously registered in another state"; (b) that were "title previously has not been issued"; or (c) for which "title previously has been issued in [Ohio]." *Id.* But those distinctions are not discriminatory. The statute makes no distinction between in-state or out-of-state *applicants*. An Ohio dealer seeking

to sell a Canadian imported used vehicle in Ohio would have to arrange for a physical inspection in Ohio and pay the fee, the same as a dealer from Michigan or a dealer from Canada. And that requirement is no more burdensome on the Michigan seller than it is on the Ohio seller: both must pay the $5-per-car fee and deal with the time and expense associated with obtaining the inspection in state. (Stedtefeld Dep. at 68:3–4.) The in-state inspection requirement therefore does not directly discriminate against interstate commerce, nor does it have the effect of favoring Ohio economic interests over out-of-state interests. *Am. Beverage Ass'n*, 735 F.3d at 370.

Blue Water contends that *McNeilus Truck and Manufacturing, Inc. v. Ohio ex rel. Montgomery*, 226 F.3d 429 (6th Cir. 2000), supports their position. (Pl.'s Mot. at 19.) It does not. In *McNeilus*, the statute at issue concerned requirements for obtaining a license to sell remanufactured vehicles in Ohio. *Id.* at 434. McNeilus—an out-of-state manufacturer in the business of buying truck chassis, installing concrete transit mixers, and selling the unit to customers—argued that the statute violated the dormant Commerce Clause by effectively precluding out-of-state dealers from obtaining a license because of the statute's warranty requirements. *Id.* at 442. The statute required applicants—like McNeilus—to furnish a warranty to the customer at the time of sale with a "binding agreement" between the applicant and a "new motor vehicle dealer" of the same type of chassis as the chassis on the remanufactured vehicle for the "new motor vehicle dealer" to service the chassis under the warranty. *Id.* at 434–35. The catch, however, was that statute required the service facility to be "located within either twenty miles of the applicant's . . . place of business or twenty miles of the customer's residence or place of business." *Id.* at 435. The BMV interpreted this language to require McNeilus to contract with "franchised dealers, for each brand of chassis sold by McNeilus, located within 20 miles of McNeilus's Gahanna, Ohio branch office (or, somewhat impractically, with such dealers within

23

20 miles of every one of its customers)." *Id.* at 435. McNeilus contacted local Ohio chassis dealers seeking to obtain contracts, but most local dealers refused; one even told McNeilus to "Go to Hell." *Id.* at 436.

The Sixth Circuit held that the licensing statute violated the dormant Commerce Clause because it "threatened to slow the flow of out-of-state remanufactured vehicles into Ohio." *Id.* at 442–43. The court also determined that the statute was protectionist; "in-state truck chassis dealers [stood] to gain nothing from signing binding agreements with companies like McNeilus, because such companies [did] not buy their chassis from Ohio dealers." *Id.* at 442. In-state chassis dealers—the "new motor vehicle dealers" with whom McNeilus was required to contract—could choose to contract only with remanufacturers who purchased their chassis from those dealers, eliminating the ability of out-of-state remanufacturers—who did not purchase chassis in Ohio—to obtain a license to sell in Ohio. *Id.*

The statute and BMV guidance challenged in this case are not like the statute in *McNeilus*. Here, there is no evidence in the record that the in-state inspection requirement is protectionist in purpose or effect. The statute in *McNeilus* eliminated competition from out-of-state remanufacturers by functionally prohibiting them from obtaining a license to sell their product in Ohio. *Id.* It did so by giving Ohio chassis dealers unfettered discretion to refuse to contract with out-of-state remanufacturers for warranty service, eliminating the ability of the out-of-state businesses to obtain a license under the statute. *See id.* In this case, the record contains no evidence Ohio car dealers have not refused to provide inspections for out-of-state used vehicle importers. Indeed, Blue Water uses a Toledo dealer to perform the in-state inspections for the vehicles its clients import from Canada. (Dempsey Dep. 45:1–6, 79:10–12.) But even if Ohio car dealerships refused to inspect vehicles imported by out-of-state businesses in an effort to insulate in-state

24

sellers, Ohio permits an applicant to have an inspection performed at any "deputy registrar" location in Ohio. Ohio Rev. Code § 4505.061. Thus, unlike the licensing statute in *McNeilus*, the in-state inspection requirement here has no discriminatory effect on out-of-state importers like Blue Water. And the articulated purpose of the inspection requirement—preventing fraud and verifying the physical existence of the vehicle for which title is being requested—is not a protectionist purpose. (*See* Imler Aff.)

Blue Water also poses two comparisons that it contends shows how the inspection requirement favors in-state interests over out-of-state interests. Neither comparison is on point.

First, it points out that an Ohio resident who is either (a) in the military or (b) lives temporarily out of state may purchase an out-of-state used vehicle and have that vehicle's required inspection performed in another state by law enforcement or military personnel. (Pl.'s Mot. at 18.) That exception, however, does not apply to businesses—whether in state or out of state. And those Ohio residents must still incur the time and expense associated with obtaining a physical inspection by an authorized entity on an Ohio-BMV-issued form.

Second, Blue Water points out that Ohio sellers may sell imported vehicles already registered in the state without arranging for an inspection. (*Id.*) But that observation is immaterial. Blue Water challenges Ohio's title application requirements for vehicles *last registered out-of-state* (specifically, used vehicles imported from Canada). The requirements for the sale of vehicles *already registered* in Ohio are not relevant to Blue Water's dormant Commerce Clause claim. Any out-of-state car dealer, like any Ohio dealer, could obtain a certificate of title for a used vehicle *already registered* in Ohio without arranging for a physical inspection of that vehicle.

In sum, the in-state inspection requirement does not discriminate against interstate commerce. Because Blue Water has not met its burden of proving that the in-state inspection

requirement is discriminatory, the analysis moves on to step two: *Pike* balancing. *Int'l Dairy*, 622 F.3d at 644.

    **2.** *Pike* **balancing.**

Under the "deferential" *Pike* balancing test, the Court will uphold the challenged requirement "unless the burden it imposes upon interstate commerce is 'clearly excessive in relation to the putative local benefits.'" *Int'l Dairy*, 622 F.3d at 644 (quoting *Pike*, 397 U.S. at 142); *Tennessee Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 450 (6th Cir. 2009). The in-state inspection requirement survives this test.

Start with the burdens. Blue Water compensates its drivers for the additional "half hour, [or] hour" an inspection takes. (Dempsey Dep. 47:13.) All applicants must pay a $5 fee per car. (Dempsey Dep. 78:9–10.) And importers like Blue Water must divert from their ultimate destination, such as an auction, to obtain the inspection during regular business hours. (Pl.'s Answers to Interrogatories No. 3.)

Now consider the putative local benefits. Ohio's "motor vehicle certificate of title laws" are "an authorized exercise of police power on the part of the General Assembly[.]" *Leslie v. Lacy*, 91 F. Supp. 2d 1182, 1194 (S.D. Ohio 2000) (citing *State ex rel. City Loan & Savings Co. v. Taggart*, 17 N.E.2d 758 (1938)). Ohio maintains that the "inspection requirement protects the integrity of state-issued ownership documents, helps combat theft and fraud within the state, and facilitates the legal transfer of property within the state." (Def.'s Resp. in Opp'n at 14; Stedtefeld Dep. 58:23–59:11.) The Court agrees.

The original "purpose of the Ohio Certificate of Title Act was to prevent the importation of stolen motor vehicles and to protect Ohio bona fide purchasers against thefts and wrongdoers, and to create an instrument evidencing title which would more adequately protect innocent

purchasers." *Switzer v. Carroll*, 358 F.2d 424, 428 (6th Cir. 1966) (citing *Commercial Credit Corp. v. Pottmeyer*, 197 N.E.2d 343 (Ohio 1964)). The American Association of Motor Vehicle Administrators cautions that "[d]uring the importation process, not every vehicle is physically inspected by CBP and each inspector does not always check confidential VINs" and that "jurisdictions develop a physical inspection program to ensure the vehicle is physically located in the jurisdiction where it is being titled and that the vehicle is properly identified." (Imler Aff., Ex. A-1.) Thus, the in-state inspection requirement is consistent with the industry standard to best protect the integrity of motor vehicle titles and prevent fraud.

The minimal burdens imposed on commerce are not "clearly excessive" in relation to the important putative local benefits served by the in-state inspection requirement. The in-state inspection requirement survives the deferential *Pike* balancing test. It therefore does not violate the dormant Commerce Clause.

For these same reasons, there is no evidence in the record that Ohio's certificate of title requirements discriminate against foreign commerce or implicate an area with "special need for federal uniformity." *Barclays Bank PLC*, 512 U.S. at 311 (quoting *Wardair Canada Inc.*, 477 U.S. 8). Issuing certificates of title for motor vehicles is a function of each state, and the federal regulations expressly contemplate relying on state titling systems. See 28 C.F.R. 25.52 ("Certificate of title means a document issued by a state showing ownership of an automobile."). Defendants are therefore entitled to summary judgment on Blue Water's dormant Commerce Clause and Foreign Commerce clause claims.

## IV. Conclusion

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES AS MOOT IN PART** Defendants' Motion for Summary Judgment. (ECF No. 98.) The Court **DENIES IN**

**PART** and **DENIES AS MOOT IN PART** Plaintiff's Motion for Summary Judgment.  (ECF No.

99.)  The Clerk is **DIRECTED** to enter judgment in favor of Defendants and close this case.

      **IT IS SO ORDERED.**

<u>**8/3/2021**</u>                    <u>s/Edmund A. Sargus, Jr.</u>
**DATE**                         **EDMUND A. SARGUS, JR.**
                                  **UNITED STATES DISTRICT JUDGE**